ROGER W. CULL ᴇᴛ ᴀʟ. *vs.* JOHN B. A. WHELTLE ᴇᴛ
ᴀʟ., THE BOARD OF POLICE COMMIS-
SIONERS OF BALTIMORE CITY.

*Constitutional Law—Power of Governor to Suspend Civil Of-
ficers Pending Trial of Charges Against Them—Power of
Governor to Make Temporary Appointment in Place
of Officer Suspended.*

The Act of 1900, Chap. 15, authorizes the Governor to appoint,
by and with the advice and consent of the Senate, three per-
sons to constitute the Board of Police Commissioners for
Baltimore City, who shall hold office for the term of two
years. The Constitution, Art. 2, sec. 15, provides: "The Gov-
ernor may suspend or arrest any military officer of the State
for disobedience of orders or other military offense, and may
remove him in pursuance of the sentence of a court-martial;
and may remove for incompetency or misconduct all civil
officers who receive appointment from the Executive for a
term of years." No other power of removal is given to the
Governor by statute or by the Constitution, and no express

power to suspend civil officers. The Constitution of 1776 did authorize the Governor to suspend, as well as to remove, civil officers, but the power to suspend was omitted from the Constitution of 1851, and the present Constitution. *Held,* that the Governor has no express power to suspend the Police Commissioners appointed by him with the consent of the Senate, pending the trial of charges against them of incompetency and misconduct, and that no such power can be implied from the existence of the power to remove for cause after trial.

*Held,* further, that since, under Constitution, Art. 2, sec. 11, the Governor has the power to appoint to the office of Police Commissioner, during the recess of the Senate only in case of a vacancy occurring in the office, and since the suspension of such officer does not create a vacancy, the Governor has no implied power to make a temporary appointment to the office, pending the investigation of charges against a Commissioner.

*Decided November 30th, 1910.*

Appeal from the Superior Court of Baltimore City (HAR-LAN, C. J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*Isaac Lobe Straus, Attorney General, Isidor Rayner* and *Randolph Barton* (with whom was *Wm. Pinkney Whyte, Jr.,* on the brief), for the appellants.

1. All the authorities, including the Courts and the text writers, unanimously agree, without a single exception or the slightest spark of dissent anywhere, that the right to remove for cause after hearing includes as an incidental and auxiliary power the right temporarily to suspend pending the hearing and decision of the charges. All the cases upon this

subject are one way, that is, in favor of such power of suspension.

The power here under consideration, which is claimed on behalf of the Governor of the State, is the power temporarily to suspend, pending charges, peculiar, incidental and appropriate to the power to remove for such charges, if they are found to be true. It involves merely a limited suspension while the charges are pending, as an auxiliary and concomitant to the power to remove for the causes named. That is the power which is under consideration. With respect to the existence of such an implied incidental and auxiliary power attached to and inherent in the power to remove for cause, all the authorities, without a breath of dissent anywhere, are united and agreed. And furthermore in support of that particular power, it is submitted that every principle of law, of public policy and of reason are also united.

The power of suspension, which is not before the Court, with which we have not the slightest concern in this case, and from confusion with which it is important to keep free and clear, is a power to suspend, not at all auxiliary or incidental to the power of removal for cause, not a temporary suspension pending charges, but an indefinite suspension, equivalent and tantamount in effect to removal itself. This is a different thing altogether from the power herein involved. No such power is claimed or pretended to exist in the Governor. We have nothing to do with it in this case.

In the Editorial Note to the case of *Griner* v. *Thomas,* 16 American and English Annotated Cases, pages 946-7, the particular subject here under consideration is discussed and the authorities are declared to be unanimously as above stated.

In 17 *A. & E. Enc. of Pleading and Practice,* page 222, title Public Officers, sub-title Suspension Pending Trial, it is said: "The power of removal includes the power of suspension; therefore after the preferment of charges and pending a trial thereon, if the case is one wherein a conviction

would involve a dismissal of the accused officer and warrant his removal, it is wholly proper to suspend the accused pending the investigation."

In 29 *Cyc.,* page 1405, title Officers, sub-title Suspension, it is said: "Where no express power to suspend has been granted the Courts do not recognize that the power is included within the arbitrary power to remove, if the exercise of the power to suspend will produce an interregnum in office. The needs of discipline in such a case may be sufficiently subserved by the exercise of the power of removal and do not require the recognition of a power to suspend. But where the power of removal is limited to cause the power to suspend, made use of as a disciplinary power pending charges, is regarded as included within the power of removal. See also *Dillon, Mu. Corp.,* section 248; 23 *A. & E. Ency.,* 451; 2 *Ibid,* 843; 5 *Supplement, Ibid,* 1553; *State ex rel. Douglas* v. *Megaarden,* 85 Minn. 44.

In *State* v. *Peterson,* 50 Minn. Reports, 239, it was explicitly held that the power to remove includes the power of temporary suspension pending the trial of the officer.

The case of *State of Missouri ex rel. J. W. Campell, appellant,* v. *Police Commissioners et al., Respondents,* June 17, 1884, 16 Missouri Appeal Repts., 48-51, is to the same effect.

In *Fields* v. *State* (8 Tenn.), Martin and Yerger, 176-177, it is explicitly said: "The Court having power to remove had power to suspend, which as certainly follows, as that the whole includes all the parts." In *Metsker* v. *Neally,* 25 Pac. Reptr. 206 (41 Kansas, 123), the Court said: "We can readily believe the greater power to remove includes the lesser power to suspend." In *U. S.* v. *Murray,* 101 U. S. 536, it was held by the Supreme Court that the Secretary of the Treasury may put an employe on furlough without pay at any time if the exigencies of the service require it. See also *State ex rel. Brison* v. *Lingo,* 26 Mo. 498; *Shannon* v. *Portsmouth,* 54 N. H. 183; *Maben* v. *Rosser,* 103 Pac. Rep. 674;

*Rice* v. *Mineapolis,* 105 Minn. 246; *Wertz* v. *U. S.,* 40 Court of Claims, 397; *Howard* v. *U. S.,* 22 Court of Claims, 305; *Sumpter* v. *State,* 81 Ark. 60; *State* v. *Board of Police Commissioners,* 170 Indiana, 137.

The cases of *Gregory* v. *The Mayor,* 113 N. Y. 416, and of *Emmitt* v. *The Mayor of New York,* 128 N. Y. 117, and of *State* v. *Jersey City,* 27 N. J. L. 536, and *United States* v. *Wickersham,* 201 U. S. 390, and the statements in the text of *Throop on Public Officers, section* 404, and of *Meacham on Public Officers,* section 453, all deal with an entirely different right of suspension than the right here involved.

There are two fundamental and radical differences between the right of suspension with which those authorities deal and the right of suspension under consideration in this case.

The authorities above mentioned deal with an arbitrary right of suspension and also an indefinite suspension.

The nature and purpose of that sort of suspension and the principles of law applicable to it are wholly distinct and different from the nature and object and of the principles of law applicable to the limited and temporary suspension pending charges as an incident to the power to remove for cause, which is here in question.

2. The settled maxims of the law and rules of constitutional and statutory construction also support the power of temporary suspension here under consideration.

3. The reason and policy of the law, the necessities of administration and the convenience and protection of the public favor and enforce the existence of such power.

"The suspension of an officer pending his trial for misconduct, so far as to tie his hands for the time being, seems to be universally accepted as a fair, salutary and often necessary incident to the situation. His retention at such a time of all the advantages and opportunities afforded by official position may enable and encourage him, not only to persist in the rebellious practices complained of, but also to seriously embarrass his triers in their approaches to the ends of jus-

tice." *State* v. *Police Commissioners,* 16 Mo. App. 50, approved and adopted in *State* v. *Peterson,* 50 Minn. 244; also in *State* v. *Megaarden,* 85 Minn. 41, and in *Thomas* v. *Griver,* 101 Texas, 38.

4. The language of Article 2, section 5 of the State Constitution is to be construed as clearly including the power temporarily to suspending charges.

It was absolutely necessary to confer the right of suspension in the case of military officers, because the Governor has the right of removal only upon the sentence of a court-martial. Therefore, not having the right of removal otherwise, it might be claimed that he could not suspend in the case of military officers, unless the Constitution expressly gave it to him. Moreover, it will be noted that the word suspend is used in section 15 of Article II of the Constitution for the purpose of prescribing a distinctively miltary punishment, just as the word "arrest" is used for the same purpose.

Neither of these punishments of suspensions and arrest, as they are peculiarly known and applied in military matters, are employed in the same way in civil concerns, and no inference therefore can be drawn from the use of word "suspend" in the case of the militia and the absence of the word in the case of civil officers. This is illustrated by the meaning and application ascribed to suspension in relation to military officers by *Dudley on Military Law,* pages 161-2,

In relation to civil officers there was no necessity of giving the right of suspension, because the framers of the Constitution doubtless knew that when the Governor was given the right of removal for cause, he must have the right of suspension *ad interim* pending the charges. If this was not the case the officers during trial by holding on could exercise the most flagrant acts of malfeasance, or by their inability or incompetence to serve throw the community into a state of anarchy. Suppose a civil officer is insane, must the Governor wait until the trial is over before he can act? Suppose he

should be guilty of acts of usurpation and of grave official misconduct?. Must the Governor stand by and permit him to remain in office until perhaps his time expires by his postponing and delaying the proceeding of the trial?

Some effort was made during the argument below by the learned counsel for the appellees to draw from the proceedings of the Convention of 1851 an inference against the existence of the Governor's power of temporary suspension pending the disposal of charges of misconduct or incompetence against civil officers.

It is submitted with perfect confidence that the proceedings of that Convention furnish no light whatever upon the point here under consideration. There was nothing done or said in that distinguished body, as far as the published reports of its proceedings and debates disclose, which bears at all upon the question here presented.

5. The provisions of Article II, sections 1, 8 and 9 of the Constitution vesting in the Governor the "Executive Power of the State," requiring him "to enforce the laws" and "to take care that the laws are faithfully executed" taken together with section 15 making it his duty to remove civil officers for misconduct or incompetency, render it clear and certain that the power of temporary suspension must exist in the Governor. This is in accordance with the settled interpretation of the Federal Constitution by all the branches of the United States Government from its foundation to the present time, as well as the interpretation of State Constitutions by the Courts and political departments of the several States.

There is not a word in the Federal Constitution expressly giving to the President the right to remove an officer.

As an incident, under the Constitution, of his right to remove, the President has always exercised the right to suspend. These powers of the President to remove and suspend are derived, according to the prevailing view of those who framed the Constitution, of the Supreme Court of the United

States, of its Attorney-Generals and of the most responsible statesmen in the history of the Nation from the adoption of the Constitution to the present time chiefly from the "executive power" which the Constitution vests in the President and from his power and duty "to take care that the laws are faithfully executed."

Congress has acted upon the same doctrine of implied powers with respect to its legislation upon the subject of the removal and suspension of the "inferior" officers.

The statutes which, with respect to some departments and offices, Congress has passed providing for removals and suspensions, have been passed by that body under its authority—not expressly to pass laws on the subject of removal or suspension of officers, but under its implied incidental and derivative power deduced from the grant to Congress to "by law vest the appointment of such inferior officers as they (Congress) think proper in the President alone, the Courts of law or the heads of departments."

So that from the right to vest the "appointment" of these inferior officers in the President or the Courts or the departments, Congress derives the power to vest in them also the right to remove and the right to suspend, and also the right to make temporary *ad interim* appointments during suspension. In other words, the right given by the Constitution to provide for the appointment of these inferior officers carries with it the right to provide for the removal, the suspension and the temporary designation of persons to occupy the office during the disability of the officer suspended. *Perkins v. U. S.,* 116 U. S. 483.

The analogy between the President of the United States and the Governor of a State with respect to the "executive power" and the duty to take care that the laws are faithfully executed with respect particularly to the public offices of the Government, as well as in other respects, is generally recognized and absolutely settled by the authorities. *Miles v. Bradford,* 22 Md. 174; *Reynolds v. Bussier,* 5 S. & R. 451;

*Commonwealth* v. *Lane,* 103 Pa. St. 481; *People, etc.,* v. *Morton,* 156 N. Y. 136, 144-5; *State* v. *Governor,* 1 Dutch. N. J. 351-2; *People* v. *Bissell,* 19 Ill. 229; *Mauran* v. *Smith,* 8 R. I. 192; *State* v. *Governor,* 25 N. J. 331; *Sutherland* v. *Governor,* 29 Mich. 320; *Hawkins* v. *Arkansas,* 1 Arkansas, 585; 14 *Am. & Eng. Encyc. of Law,* page 1097; *Throop, Public Officers,* sections 794-5; *Mechem, Public Officers,* sections 952-4; *Bryce "American Commonwealth,"* Vol. I, page 36.

In the debates on the Civil Tenure Act and in the judgments delivered in the Senate sitting as a Court to try the impeachment of President Johnson, the same views were expressed by the leading lawyers of the Senate and of the country of that day. *Reverdy Johnson, Congressional Globe,* Part I, 2nd Session, 39th Congress, page 388; 3 *Impeachment, Johnson,* 56; *Wm. Pitt Fessenden,* 3 *Impeach., Johnson,* 23; *Lyman Trumbull,* 3 *Impeach., Johnson,* 325-6. See also *President Johnson's* message on the *Civil Tenure of Office Act,* which was prepared by *William H. Seward* and *Edwin M. Stanton.*

In John Randolph Tucker's excellent work on the *Constitution of the United States,* Vol. 2 sections 357-362, it is explicitly declared that the President's control over the tenure of offices, including the power of removal and its incidents, is derived from the executive power vested in him and his power "to take care that the laws are faithfully executed."

In *Shurtleff* v. *The United States,* 169 U. S. 311, it was held, that although Congress had created an office and provided for the removal of the incumbent at any time for inefficiency, neglect of duty or malfeasance in office after notice and hearing, the President nevertheless under the Constitution had full power to remove him for some other cause than those specified in the statute without even giving him notice or an opportunity to defend himself, and that in the event of a removal without notice and hearing, it must be presumed

that the removal was made by the President for some othe1 causes than those assigned in the Statute.

The opinions of the law officers of the Government have been entirely in harmony with the foregoing views. *Parsons v. U. S.,* 167 U. S. 321; *U. S.* v. *McDaniel,* 7 Pet. 1, 14-15; *Blake* v. *U. S.,* 103 U. S. 227; *Ex parte Hennen,* 13 Peters. 259; *Morgan* v. *Nunn,* 84 Fed. 551; *Carr* v. *Gordon,* 82 Fed. 373; *Taylor* v. *Kercheval,* 82 Fed. 502-3; *Lane* v. *Comm.,* 103 Pa. St. 181.

6. The power temporarily to suspend being exercised, the Governor has the power to appoint an *ad interim* board dur ing the period of suspension, pending the charges. The Governor has this power as a necessary incident to his power to remove and suspend temporarily pending the hearing of the charges.

He has the power and must exercise it as a part of the executive power vested in him by the Constitution; also in the discharge of his power and duty to take care that the laws are faithfully executed and of his power and duty to enforce the laws of the State.

7. It is contended on behalf of the appellees that there can be no *ad interim* appointments during the period of sus pension because there is no vacancy in the offices created by the suspension. We are not dealing in this case with a con stitutional vacancy that is the vacancy referred to by sections 11 to 13 of Article 2 of the Constitution, and therefore the cases of *Somerville* v. *Smoot,* 59 Md., and the *Watkins Case,* in 2 Md., are not applicable or in point herein.

We are dealing with a status created by the suspension, wherein there is no *de facto* incumbent of the office actually performing its duties. If not a technical and absolute va cancy, the situation presented is practically a temporary vacancy in the office. For all practical purposes it calls for the filling of the office during the limited term of the sus pension.

The point raised about the existence or non-existence of a "vacancy" is a mere matter of names. While the officer is suspended there is no one actually in charge of the office or in the exercise of its duties. That is a status or condition calling for an appointment for the temporary execution of the office. Under the suspension there is no one in the office. It makes no difference what the status is called. While the suspension exists it may be said that there is not a technical and absolute vacancy. It is a suspension of the incumbent from the exercise of the duties of the office. He is withdrawn from the office and the office is relieved temporarily of his occupancy of it. For the time being he is not in it and therefore for the time being he is out of it. There is a void there. The office is without a *de facto* incumbent. Whilst that continues its functions must stop, for the very practical and obvious reason that there is no one there to perform them. That is a well-known condition, which sometimes arises from one cause or another in our governmental life of which all the departments of the Government take and have always taken cognizance—the Courts, the Legislature and the executive. It is a condition which must be dealt with and it is dealt with and can be dealt with in only one way, and that is to appoint someone temporarily to carry on the office and execute the law for the maintenance of the Government and for the convenience and protection of the people, whose well-being the laws are intended to subserve.

Upon such considerations in *U. S.* v. *Farden,* 99 U. S., page 18, the Supreme Court effectually disposed of this exact point.

And many other cases illustrate the same fact and principle. *Attorney-General* v. *Taggart,* 66 N. H. 363-5; *Sprague* v. *Brown,* 40 Wis. 618; *Wilson* v. *N. C.,* 169 U. S. 586; *In re Marshalship,* 20 Fed. 379; *Herndon* v. *U. S.,* 15 Ct. of Claims, 452-3; *Stuebenville* v. *Culp,* 38 Ohio State, 23; *Brown* v. *Duffus,* 66 Iowa, 197-8; *Marr* v. *Stearns,* 72 Minn. 212-214; *Gordon* v. *Campbell,* 2 Cali. 135; *Woodworth* v.

*Hall,* 1 Woodberry and Minot, 390-1; *Farrow* v. *Bigby,* 4 Woods, U. S. Ct. Ct.; *People* v. *McKee,* 68 N. C. 437; *State* v. *Johnson,* 30 Fla. 1; *Advisory Opinions to Governor,* 31 Fla. 1, 3; *People* v. *Bissell,* 49 Cali. 411; *Cooley Constitutional Limitations,* note, pages 99-100, 7th Edition.

And in *Westburg* v. *City of Kansas,* 64 Missouri, 504, in a case where there had been a temporary suspension of an officer pending charges against him, the Court said: "The law gives the corporation the right to suspend one and this suspension is generally for some fault of the officer and necessities the employment of another to perform his duties." See also *Howard* v. *U. S.,* 22 Ct. Cl., page 317; *Wertz* v. *U. S.,* 40 Ct. Cl. 401.

8. The power of temporary suspension pending charges existing and being exercised, the following Maryland decisions are, it is respectfully submitted, conclusive in favor of the right and duty of the Governor to make the temporary appointments. *Robb* v. *Carter,* 65 Md. 321; *County Comrs.* v. *School Comrs.,* 77 Md. 290; *Kroh* v. *Smoot,* 62 Md. 172; *Marshall* v. *Harwood,* 5 Md. 423.

9. The Governor, as the proceedings show, having taken jurisdiction over the charges as sufficiently setting forth both incompetency and official misconduct, his discretion, judgment and action in that respect, exercised in the execution of his powers and duties as the executive head of one of the co-ordinate branches of the Government, and with respect to a power and duty specially committed to him by the Constitution, are not subject to review or control by the judicial department, an equal and co-ordinate but not superior branch of the Government.

The Court could not proceed by injunction, mandamus or otherwise to compel the Governor to take jurisdiction and act or to restrain him from taking jurisdiction and acting on the charges preferred, and therefore the Courts cannot in this proceeding accomplish collaterally and indirectly what they could not do directly and immediately. *Miles* v. *Brad-*

*ford,* 22 Md. 170; *Worman* v. *Hagan,* 78 Md. 151; *Martin* v. *Mott,* 12 Wheat. 19; *Miss.* v. *Johnson,* 4 Wall. 475; *Keenan* v. *Perry,* 24 Texas, 259; *Guden's Case,* 171 N. Y. 529; *State* v. *Ansel,* 76 S. C. 395; 11 *A. & E. Anntd. Cases,* 316; *Opinion to the Governor,* 58 Mo. 372; *State* v. *Doherty,* 26 La. Annual, 120; *Gaines* v. *Thompson,* 7 Wall. 347; *Decatur* v. *Paulding,* 14 Pet. 497; *Keim* v. *U. S.,* 177 U. S.; *Boynton* v. *Blaine,* 137 U. S.; *U. S.* v. *Windom,* 139 U. S. 636; *Dudley* v. *James,* 83 Fed. Reporter, 349; *Morton,* 156 N. Y.; *Sutherland* v. *Governor,* 29 Mich., *supra; Bates* v. *Taylor,* 87 Tenn. 319; *People* v. *Wilcox,* 90 Ill. 196; *Attorney-Genl.* v. *Brown,* 1 Wis.; *Keim* v. *U. S.,* 33 Ct. of Claims, 185; *State* v. *Pol. Commsrs.,* 170 Ind. 133; *Throop Public Officers,* sec. 794; *Meecham Public Officers,* sec. 952; *O'Neil* v. *Fire Commsrs.,* 59 Md. 283; *Green* v. *Purnell,* 12 Md. 329; *In re Moyer,* 85 Pac. Rep. 192 (35 Col. 164-5); *Luther v. Borden,* 7 Howard, 1; *Ex parte Moore,* 64 N. C. 802; *State v. Fair,* 76 Pac. Reptr. 732 (35 Wash. St. 127); *People* v. *Byrd,* 98 Ga. 691; *U. S. ex rel. Edwards* v. *Root, Sec'y of War,* 22 Appeal Cases, D. C. 419, by Alvey, C. J.; *U. S.* v. *Hitchcock,* 190 U. S. 316.

*Edgar H. Gans* and *Wm. S. Bryan, Jr.* (with whom were *Chas. F. Harley* and *Jos. R. Gunther* on the brief), for the appellees.

In section 15 of Article 2 of the Constitution the whole subject of suspension and removal was provided for. This section was not intended to give power not possessed by the executive before. It is taken *verbatim* from the Constitution of 1851, and prior to 1851, as we shall see, the Governor had an almost unlimited power of suspension and removal. The section was intended to limit and restrain the power of the Governor, and to state just how far the Governor could go. He has therefore no powers of suspension and removal in the classes of officers specified than those contained in this section. It is observed that the section deals with (*a*) military

officers, and (*b*) civil officers who received appointment from the executive for a term of years. As to (*a*) military officers the power of suspension is expressly given as well as the power of removal; as to (*b*) "civil officers who received appointment from the executive for a term of years," the only power given is the power of removal and that is limited to removal for incompetency and misconduct, which means after a fair and impartial trial.

When the section 15 of Article 2, is placing restraints upon the power of the Governor; when both powers of suspension and removal are being considered in the same section; when the power of suspension is given to one class of officers in express terms and not given to the other class; when the power of removal in both classes is expressly limited, how can it be argued that the arbitrary power of suspension of any kind can be implied or inferred? No inference or implication is permissible when it is evident that the Constitution is expressly treating, as to these classes of officers, of the whole subject of removal and suspension.

This conclusion is strengthened by what took place in the convention which framed the Constitution of 1851. This throws additional light upon the situation and shows that in 1851 the powers held by the Governor prior to that time were being curtailed, and that section 16 of Article 2 in the Constitution of 1851, copied verbatim as section 15, Article 2 of the Constitution of 1867, was not a remedial section to be extended by implication, but a restrictive section to be construed in the line of a curtailment instead of an extension of executive powers.

The appellants would not contend that the Governor had the right of temporary suspension of the Board of Police Commissioners, if the effect was to leave the police department without a head. Their course of argument is as follows: First they imply the power of temporary suspension as a reasonable and convenient means of more effectively trying the removal charges. Then, inasmuch as a suspension pending

charges. would leave the office with no one to perform its duties, they further imply a right of temporary appointment, pending the charges, of a new board—implication breeding further implication—this double implication is absolutely necessary to their case, for the power of temporary suspension and the power of temporary appointment occasioned by the suspension, are correlatives and the former would not exist without the latter. This is the use the appellants make of the admitted principle that while the office exists there should be some one to continuously perform its duties.

The appellees, however, make a far different use of this principle. If the power to temporarily suspend does not exist unless the Governor has the correlative right to temporarily appoint a new board, the appellees proceed to investigate the independent question whether the Governor has the right to make the temporary appointment. If the Governor has under the Constitution and the decisions of this Court no power to make the appointment, temporary or otherwise, then it is clear to a demonstration that the power to temporarily suspend does not exist; for this would leave the office with no one to perform its functions, which both sides agree is a legally impossible situation.

Let us proceed to investigate the independent question whether the Governor during the recess of the Senate, has the power to make the temporary appointment as claimed. At the outset it is necessary to point out that suspension is not the same thing as a removal. One prevents the officer from exercising the functions of his office, and likewise deprives him of his salary. The other creates a vacancy which authorizes the filling of the office by the appointing power. The authorities on this point are unanimous.

In *Gregory* v. *Mayor,* 113 N. Y. 416 (see also 3rd L. R. A., page 854), JUDGE PECKHAM, afterwards Associate Justice of the Supreme Court of the United States, says: "The power to remove is the power to cause a vacancy in the position held by the person removed, which may be filled at once,

and if the duties are such as to demand it, it should be thus filled. The power to suspend causes no vacancy and gives no occasion for the exercise of the power to fill one. The result is that there may be an office, an officer and no vacancy, and yet none to discharge the duties of the office. By suspension the officer is prevented from discharging any duties, and yet there is no power to appoint anyone else to the office because there is no vacancy."

In *State* v. *Jersey City,* 25 N. J. L. 563, the Court held that expulsion creates a vacancy that can be supplied by a new election. Suspension from the duties of the office creates no vacancy. The seat is filled, but the occupant is silenced.

In *Remley* v. *Matthews,* 84 Ark. 598, the Court says: "He did not cease to be sheriff because of his suspension pending the indictments against him. His suspension from the office of sheriff only disabled him from discharging the duties of the office and did not take away the office itself. Only removal from the office could do that."

In the case of *Sumpter* v. *State,* 81 Ark. 60, the Court says: "There is a distinction between a suspension and a removal from office. In the case of suspension the defendant still remains an officer and there is no vacancy, but as a matter of public policy, he is prevented from exercising the duties of the office while an indictment is pending against him."

So in the case of *Griner* v. *Thomas,* 114 S. W. 1058 (19 Tex. C. T. R.), the Court says: "Still a suspension is in no proper sense the same thing as a removal. We are not at liberty, by construction or otherwise, to hold that the provisions of the constitution with regard to removal apply equally to suspension from office."

In *Ex parte Hennon,* 13 Peters, 225, the Supreme Court of the United States says, on page 261: "There could not be two clerks at the same time. The officers would be inconsistent with each other, and could not stand together."

If, therefore, the temporary suspension would be allowed to go into effect, it is quite certain that no vacancy in the office would be created. Now it is also clear from the Constitution and the decisions of this Court that the Governor has no power of appointment of any kind during the recess of the Senate except to fill a vacancy. *Smoot* v. *Somerville,* 59 Md. 84. See also to the same effect *Watkins* v. *Watkins,* 2 Md. 355-6.

It appears then from the Constitution and the decisions of this Court that no appointments can be made by the Governor during the recess of the Senate unless in case of absolute necessity, and that this absolute necessity means the existence of a vacancy. The appellants contend that a right of temporary appointment follows from the implied right of suspension which is not founded on any necessity at all, but at most can only be claimed to be a reasonable and convenient implication. Since there is no power in the Governor to appoint there can be no power to suspend for this would leave the office without any one to perform its functions.

In *Kroh* v. *Smoot,* 62 Md. 175, this Court has held that where the Governor appoints during the recess of the Senate the Constitution fixes a precise term of office for the new appointee, to wit, from the time of the appointment to the end of the Legislature next ensuing the appointment. The fallacy in the appellants' case is therefore also shown by the form of the commission issued to the appellants in this case, which does not run until the end of the next session of the Legislature, but only until the termination of the trial of the charges against the Commissioners. The trouble with the appellants' case is that every part of it antagonizes the Constitution of the State and the decisions of this Court.

Further light is shed upon this question by the policy of our legislation with respect to suspensions of public officers. With reference to the higher and more important offices there has never been any legislation concerning suspensions. It has been recognized that under the Constitution they were

intended to be independent in their action and not under the control of the Governor in any way in the performance of their duties. He appoints them, by and with the consent of the Senate; or, in the recess of the Senate, he fills a vacancy. There his power stops. He has nothing to do with the detailed administration of the duties of the respective offices. He cannot set up his judgment against the judgment of the officer who is responsible for the due performance of the duties of that office. If he would undertake to interfere he would be an intermeddler. When, however, an officer becomes incompetent or is guilty of misconduct in office, then the Governor's power again comes into play, and for certain causes he may remove after the officer is convicted on a fair and impartial trial. But between the appointment and the removal the officer has independent charge of his office. This policy has always been recognized by the Legislature.

But there are minor offices, with respect to which a power of detailed supervision is desirable, and as a sanction for this supervision suspension from the functions of an office for a limited time is often found effective. Even as to those it has been thought necessary to provide for them by definite legislation whereby the power of suspension is limited and regulated.

Thus, it is definitely provided by statute for the suspension of: policemen (*Balto. City Code*, sec. 749); persons licensed to measure or inspect oysters (1906, Ch. 188); street cleaners (*City Code*, Art. 36, sec. 16); officers of the State fishery force (*Code*, Art. 72, sec. 36); licensed pilots (*Code*, 74, sec. 15); county school superintendents (*Code*, Art. 77, sec. 11); and other instances.

For the reasons already indicated the numerous references of the Attorney-General to the practice under the Federal Government have no application. There is not a line in the Constitution of the United States respecting removals from office except by impeachment. Hence the whole power of removal exercised by the President was derived from the ap-

pointing power. Many of the best lawyers in the country have denied that the power of the President to remove public Federal officers without the assent of the Senate is properly deducible from the appointing power, but all have agreed that owing to the history of the exercise of the power, it could not at this late day be questioned. This history is given by the Supreme Court of the United States in the case of *Parsons* v. *U. S.*, 167 U. S. 324.

Nor can decisions in other States, having different constitutions and a different policy in relation to the executive power, be of much assistance.

We believe the real philosophy of the situation to be best stated by JUDGE PECKHAM (afterwards Justice in the Supreme Court), in the case of *Gregory* v. *Mayor*, 113 N. Y. 416, where the Court says: "If it be claimed that the power to suspend also includes the power to fill the place of the officer suspended during such suspension, then there is a second presumed power which flows from the simple power to remove. There is the power to suspend and there is the further power to be implied from it, viz, the power to fill the office with another during such suspension, though there is no vacancy in the office. We do not think either of those last-named powers should be implied in the mere grant of the power to remove. We are not inclined to go so far with the doctrine of implied grants of power because we think the implication is not one which naturally or necessarily arises out of the nature of the main power granted, and its denial in cases like this can work no possible mischief." See also *Emmitt* v. *Mayor*, 128 N. Y. 117; *Wickersham's Case*, 201 U. S. 390; *State* v. *Jersey City*, 1 Dutcher, 536, 25 N. J. L. 563; *Leftbridge* v. *Mayor*, 15 N. Y. Suppl. 562.

The charges filed do not amount on their face to charges of incompetency or official misconduct within the meaning of the Constitution in such a way as to give the Governor jurisdiction to try the appellees.

*J. Southgate Lemmon,* filed a brief on behalf of C. Baker Clotworthy, one of the appellees.

Boyd, C. J., delivered the opinion of the Court.

The appellees were on the 24th day of September, 1910, members of and constituted the Board of Police Commissioners of Baltimore City. On that day the Hon. Isaac Lobe Straus, Attorney-General of Maryland, preferred before the Governor "complaints and charges of incompetency and official misconduct" against them, and the Governor named Wednesday, October 12th, 1910, as the time for a hearing.

On October 8th the Governor notified each of the three that in view of the charges and complaints against him he was suspended as a member of the Board of Police Commissioners of Baltimore City, from that date until the decision and determination of the charges and complaints against him, and ordered him to turn over the possession, property, effects and appurtenances of said office to such person as may be appointed by him to hold and exercise the duties of said office for the indicated period of temporary suspension. A commission was issued on the same day to each of the three appellants by which each was appointed a member of the Board during the period of the pendency of the charges and complaints against the suspended member whose place he was appointed to, "and until the said charges and complaints shall, after inquiry, examination and hearing thereinto and thereof, have been decided and determined."

The appellees having refused to surrender their offices to the appellants, the latter filed a petition for a mandamus. An answer was filed by the defendants (the appellees) to which the petitioners (the appellants) demurred. The demurrer was overruled and, no further proceedings having been taken by the petitioners, an order was passed refusing and finally dismissing the petition, with costs to the defendants. From that order this appeal was taken.

As this is the first time the right of the Governor to suspend an officer, pending proceedings to remove him for cause, has been presented to this Court, or its predecessors, for determination, or, so far as we are aware, has arisen in any of the Courts of this State, the case is one of more than usual importance to the people of the State at large, as well as to the parties immediately concerned. The appellees have urged several grounds for denying the right of the appellants to the writ of mandamus, but we will only consider such as we deem necessary or desirable to be determined on this appeal.

The primary question is: "Had the Governor the power, under the Constitution and laws of this State, to suspend these officers, pending the proceedings to remove them on the charges and complaints of incompetency and misconduct in office?"

That inquiry is made assuming, but not deciding, that the specifications filed do amount to charges of incompetency and misconduct in office, within the meaning of the law under which the appellees were appointed.

A Board of Police Commissioners for Baltimore City has been in existence for fifty years, but the number of members, the method of their appointment, and other provisions have been changed several times. By the Act of 1900, Chapter 15, the Governor was authorized to appoint, by and with the advice and consent of the Senate, three Commissioners for the term of two years and until their respective successors were appointed and qualified—their terms beginning on the first Monday of May next ensuing their appointment. Prior to that time the Commissioners were elected by the General Assembly (the Mayor being *ex officio* a member until 1867), and the Governor had no power to appoint, excepting to fill vacancies during the recess of the Legislature. From 1867 to 1900 the General Assembly, if in session, was authorized to remove the Commissioners for official misconduct, and during the recess of the Legislature the Governor

was empowered to remove them on conviction of any felony before a Court of law, and to appoint successors to such delinquent Commissioners until the next meeting of the Legislature.

By section 740 of Article 4 of the Code of Public Local Laws, as amended by Chapter 15 of the Acts of 1900, which is still in force, it is provided, that "Any of said Commissioners shall be subject to removal by the Governor for official misconduct or incompetency, in the manner provided by law in the case of other civil officers," and section 741 provides that: "In case of the death, resignation, *removal* or disqualification of any Commissioner, the Governor shall appoint a successor for the remainder of the term so vacated, subject to the provisions of the foregoing section, and of the Constitution of the State."

It will be observed that the causes for removal are the same as those in section 15 of Article 2 of the Constitution, and the power to fill vacancies is expressly made subject to the provisions of the Constitution on that subject. We are therefore not called upon to consider, as we have sometimes been, any supposed conflict between the statute and the provisions of the Constitution, but will refer to the latter in our discussion of the case. Section 15 of Article 2 of the Constitution is: "The Governor may *suspend* or arrest any military officer of the State for disobedience of orders or other military offense; and may *remove* him in pursuance of the sentence of a Court Martial; and may *remove* for incompetency or misconduct all civil officers who received appointment from the executive for a term of years."

That language of itself must be admitted to be at least suggestive, for when the same section authorized the Governor to *"suspend* or arrest" a military officer for the causes given, and to *remove* him in pursuance of the sentence of a court-martial, and then, when it deals with civil officers, only authorizes him to *"remove"* them, the maxim *"expressio unius est exclusio alterius"* naturally suggests itself. There

is no other power of removal of these officers expressly given
to the Governor, either by the Constitution or by statute, and
there is not only no express power of suspending them given
him, but a striking contrast is made between his powers in
reference to military officers and those concerning civil offi-
cers. If it be said that it was necessary for him to have
the power to suspend military officers for disobedience of
orders or other military offence, why did the framers of the
Constitution nevertheless expressly insert that power, and yet
omit it in dealing with civil officers, if the power to suspend
them be an incident to the power to remove for cause?

But the history of this provision of the Constitution sheds
much light on the subject. Article 48 of the Constitution of
1776 provided: "That the Governor, for the time being, with
the advice and consent of the Council, may appoint the Chan-
cellor, and all judges and justices, the Attorney-General,
Naval officers, officers in the regular land and sea service,
officers of the militia, registers of the land office, surveyors,
and all other civil officers of government (assessors, consta-
bles and overseers of the roads only excepted) and may also
*suspend or remove* any civil officer who has not a commission
during good behavior; and may *suspend* any militia officer,
for one month; and may also *suspend or remove* any regular
officer in the land or sea service; and the Governor may *re-
move or suspend* any militia officer, in pursuance of the judg-
ment of a court-martial." In that Constitution he was thus
expressly authorized to *suspend or remove* any civil officer
who had not a commission during good behavior.

Then we find in the Debates and Proceedings of the Con-
vention of 1851, that when the Committee on the Executive
Department made its report, it recommended, after stating
what is now in section 15 as to military officers, that the
Governor "may *suspend* or remove any civil officer whose
term of office is not placed beyond his control by some other
provision of this Constitution." A substitute for that report
was offered, including one as follows: "He may remove any

of the civil officers of the government, of his appointment, upon satisfactory evidence of any malfeasance in office, but shall report every such case to the Legislature at the next session thereafter." There was considerable discussion as to the power of the Governor to remove, and although we do not find any special objection made by the speakers to the word "suspend," the fact is that when the Constitution was finally adopted this section was changed to read, "and may *remove* for incompetency or misconduct, all civil officers who receive appointments from the executive for a term not exceeding two years." The express power to *suspend* was thus left out of the Constitution of 1851, and it was likewise omitted in those of 1864 and 1867.

If the framers of those three Constitutions had intended that the Governor should not only have the power to *remove* civil officers, for incompetency or misconduct, but also to *suspend* them, pending proceedings for such removal, it is impossible to understand why they should deliberately have omitted the term "suspend." It is more reasonable to conclude that they did not so intend, as they knew that the power to remove given by section 15 of Article 2 might include officers of as much importance as many of those elected by popular vote. When by the Act of 1900 the Legislature gave the Governor power to appoint the Commissioners, and to remove them for official misconduct or incompetency, it by the next section (741) of the same Act provided, that "In case of the death, resignation, *removal* or disqualification of any Commissioner, the Governor shall appoint a successor for the residue of the term so vacated," but made no provision in case of suspension of a Commissioner, although in section 749 it had expressly provided that "the said Board shall have power to suspend from duty, fine or forfeit the pay of any officer or policeman," and in section 745 had said "the period of appointment in the regular police force shall be four years, unless sooner removed for official misconduct and inefficiency,

of which the said Board of Police Commissioners shall determine."

It cannot be denied by any one familiar with the provisions of the Constitutions of 1776 and 1851 that it was intended by the framers of the latter to limit the powers of the Governor. Under that of 1776 he had almost unlimited power of appointment of officers, while in that of 1851, and in the two later ones, most of the important offices were made elective by the people, and the power of the Governor to remove officers of such importance as the Police Commissioners was generally limited to action after conviction in a Court of law. It is said that the right to suspend pending proceedings to remove is essential to the protection of the public. · If that be so, the people of Maryland have been left by the Constitutions of the State in a very helpless condition for many years. Without going back of the present one, it will be seen by an examination of it that the Governor has no power to remove many of the most important officers until conviction in a Court of law, or, in some instances, after action by the Legislature. That statement applies to Judges, Clerks of Courts, Registers of Wills, the Attorney-General, State's Attorneys, Justices of the Peace, Constables, the Mayor of Baltimore and others, and there is no provision in the Constitution for the removal of Sheriffs.

Important as are the duties of those officers, it could not be pretended that if any of them were indicted, even for serious crimes, the Governor could suspend them, prior to conviction, and then only by virtue of the express power conferred upon him. We are aware that with the exception of the Justices of the Peace, the Governor does not appoint the officers above mentioned (beyond filling vacancies in certain cases), but we have referred to them in reply to what we regard an unsound argument, which is to be found in some of the cases in other jurisdictions which hold that the right to suspend, pending proceedings to remove for cause, is essential, and also for the purpose of showing that the right to sus-

pend has not been found to be necessary or desirable in Maryland, even in case of such officers as Sheriffs and Constables, upon whom the peace and good order of the counties in a large measure must depend, or the Clerks and Registers of Wills, some of whom handle large sums of public money.

The Police Commissioners of Baltimore City are officers of great importance. Each one of them gives bond in the penalty of $10,000 for the faithful discharge of his duties. They have under them very many persons, perhaps not far from a thousand; they can control the sheriff in the preservation of the public peace and quiet, can require him to summon the *posse comitatus* for that purpose; they can even call out the military forces in Baltimore City, and they have unusual and great powers. Their duties are not of a character which can be taken up today and laid aside tomorrow without great detriment to the public. It would be demoralizing to the discipline of the Police Department and injurious to the public welfare, if they could be suspended at the will of the Governor, or other appointing power, and others temporarily put in their places, and we cannot believe that the Legislature or the makers of our Constitutions ever intended that it should be done. It would be difficult for anyone to discharge the duties of Police Commissioner with that fearlessness and independence which the character of the duties peculiarly demands without making enemies, or at least having his motives misunderstood or misconstrued, and if one must be suspended because charges are preferred against him, it would be an easy way for designing people to get rid of him for the time being, for if the Governor must suspend them by reason of pending charges preferred at his instance; surely he should do so when they are preferred by others.

If the people of the State of Maryland, who framed the Constitution through their representatives and then by their votes ratified it, are to be judged by their actions, they have unmistakably declared that it is not their will that those occupying important public offices be deprived of them, mere-

ly because they are *charged* with incompetency or miscon-
duct. It is not in accord with the spirit that has character-
ized the people of Maryland at least since 1851 to say, that
one deemed worthy by the Governor and Senate of Mary-
land of a high and important office is to be even temporarily
deprived of it, before he is convicted by the tribunal which
they, through the organic law, or their representatives in the
Legislature, have said shall give him a fair and impartial
trial. Far better would it be to possibly suffer some occa-
sional inconvenience, 'or loss to the State by reason of the
incompetency or even misconduct of some public official, than
to subject one believed to be worthy of. election or appoint-
ment to the mortification and indignity of being even tem-
porarily removed, merely because charges are preferred
against him, for it is useless to suggest that an officer is not
seriously injured in both his individual and official capaci-
ties by a suspension from office, although he may be eventu-
ally acquitted of the charges against him. On his trial he
has the opportunity of letting the public, as well as the tribu-
nal before whom he is tried, judge whether he is guilty or
innocent, but a suspension on charges—in this case not even
under oath—would not only deprive him of his office for
the time being, without a hearing, but almost necessarily
carry with it some suggestion of guilt before he has an oppor-
tunity to vindicate himself. There is no necessity for such
procedure, and we are satisfied that our laws do not contem-
plate it, however it may be regarded in other jurisdictions.

Sections 12, 13 and 14 of Article 41 (Article 42 of Code
of 1860) provide the method of procedure before the Gov-
ernor. In *Harmon* v. *Harwood,* 58 Md. 1, this Court through
CHIEF JUDGE BARTOL said, in speaking of them: "The Code,
Article 42, in the sections to which we have referred, care-
fully prescribes and directs the mode by which the Governor
is required to exercise this delicate and important power, by
providing for notice to the party complained against, an
opportunity for defense, the examination of witnesses and a

full hearing of the case." Judge McSherry said, in *Miles* v. *Stevenson,* 80 Md. 358: "It is the utmost stretch of arbitrary power and a despotic denial of justice to strip an incumbent of his public office and deprive him of its emoluments and income before its prescribed term has elapsed, except for legal cause, alleged and proved, upon an impartial investigation after due notice." We are aware that both of those cases involved removals, and not merely suspensions, but section 12 of Article 41, provides, that: "Upon complaint made against any civil or military officer who *can be removed or suspended* by the Governor, the Governor may summon before him any witnesses to testify for or against such complaint," and then authorizes the payment of witnesses fees and gives power to the Governor to require their attendance. Section 13 is: "Upon complaints made under the preceding section, the party complained against shall have a copy of the complaint and notice of the time when the Governor will inquire into and examine the same." The complaints "under the preceding section" are those "made against any civil or military officer who can be removed *or suspended* by the Governor." Clearly then if the appellees are civil officers who can be suspended, they have under those sections the same right to a hearing before being suspended, as they would have before being removed, if the language of the statute is to be followed. Those sections were enacted in 1786, when the Constitution of 1776, which expressly authorized suspensions and removals was still in force, and they were just as applicable to the one as to the other. They clearly did not contemplate either by the Governor before a hearing, and hence if there is an implied power to suspend civil officers, the statute applies, and if there is not, the Legislature may have assumed it could so provide in special cases, and hence let that remain in the Code.

In *Groome* v. *Gwinn,* 43 Md. 572, this Court held that, although under the Constitution and existing laws the Governor had *jurisdiction* to hear and decide the case of a con-

tested election for the office of Attorney-General, yet until the Legislature clothed him with the authority and gave him the means and instrumentalities of exercising it, as it was authorized to do under section 56 of Article 3 of the Constitution, he had no power to examine and decide the questions raised by such contest. CHIEF JUDGE BARTOL said: "It has been argued that these powers are conferred upon the Governor by implication, upon the ground that 'where a general power is conferred, every particular power necessary for its exercise will be implied.' We are not willing to adopt this rule, in the broad and unlimited terms in which it has been stated; nor is it in any sense applicable to the present case * * * But it is clear from the terms of the Constitution that no such powers were intended to be vested in the Governor by implication. By Article 3, section 56, it is provided that 'the General Assembly shall have power to pass all such laws as may be necessary and proper *for carrying into execution the powers vested by this Constitution in any department or office of the Government, and the duties imposed on them thereby.'"

JUDGE BARTOL went on to say that many examples might be given to show the necessity for such legislation, but that a single one would suffice. He then referred to the power to remove conferred upon the Governor by section 15 of Article 2, and cited sections 13, 14 and 15 of Article 42 (now 41) of the Code. He said: "It has been argued that the general power of removal for cause, conferred on the Governor by the Constitution, might be exercised by him without the aid of these statutes; but the power thus exercised would be arbitrary, and contrary to the spirit and intent of the Constitution, no officer ought to be convicted of incompetency or misconduct, and deprived of his office without a fair and impartial trial." Can it be said in the face of that decision, and in view of the fact that the power of the Governor to suspend a civil officer was in one Constitution of the State and then omitted in the three others, and moreover that the statute, which was nec-

essary to enable the Governor to exercise the power of re-
moval, provides that when he has power to *suspend or remove,*
it can only be done by adopting the method therein prescribed,
that the Governor has the *implied* power to suspend without
a hearing, pending the proceedings for removal? There can
be but one answer to that in our judgment. Possibly the
Legislature can authorize it, but it has not done so, and
hence we express no opinion as to that.

The appellants argued that inasmuch as the Constitution
does give the Governor power to remove for cause, such power
included that to suspend, pending the proceedings to remove,
and they assert that such is the universal doctrine accepted
by other Courts and hence the framers of the Constitution
are presumed to have intended to include it. But in the first
place, we have pointed out that, whatever may be the rule
elsewhere, there is not only nothing to show that it was in-
tended to be adopted here but there is much to establish pre-
cisely the contrary—such as deliberately leaving out of the
later constitutions the power to suspend which was originally
included, inserting provisions such as we have referred to
limiting the powers of the Governor and other things we have
mentioned above. But beyond all that, even if we concede
the claim of the appellants that other Courts have unan-
imously adopted the view they contend for, they cannot right-
fully contend that the framers of the Constitution of 1867—
much less of that of 1851, when the change was first made—
knew that under the decisions the power to remove for cause
included that to temporarily suspend, and hence did not
deem it necessary to give the express power to suspend. They
could not have been of such opinion by reason of Federal
decisions, or action by the President and others connected
with the general government, for the simple reason that the
United States Constitution does not confer the power to re-
move, but the right to do so is based on the theory that the
power to appoint includes the power to remove. Nor could
the framers of our Constitution of 1851, or even the later

ones, have been influenced by the decisions of State Courts, as but few, if any, of those relied on by the appellants had then been rendered. That of *State* v. *Police Commissioners,* 16 Mo. Ap. 48, which seems to be the one most followed by other cases, was not decided until 1884, and then by a Court which was not one of last resort, although of high standing. Whatever may now be the general trend of the decisions in other States, even if they be admitted to be practically unanimous on the one side, in the absence of some constitutional or statutory barrier—there was no such principle of law so generally recognized by the Courts of this country in 1851 or 1867 as would justify us in assuming that by reason of it the framers of our Constitution intended to incidentally include the right to suspend in the power given to remove for cause, although they had deliberately omitted the power to suspend. Indeed, in one of the latest and strongest cases cited by the appellants (*State* v. *Megaarden,* 85 Minn. 44) the Court said: "The authorities in respect to the incidental right to suspend pending the hearing are meager and unsatisfactory." In the still later case of *Maben* v. *Rosser,* 103 Pac. 674, decided in 1909 and cited by the appellants, that Court said: "As between these two rules which appear to be about equally supported by the authorities * * * we feel constrained to adopt," the rule, etc.

In 22 *Am. & Eng. Ency. of L.,* 451, published as late as 1903, it is said: "Though the authorities are meager and unsatisfactory, the rule in several jurisdictions is that the" suspension pending the investigation of charges is not an improper exercise of authority. In some of the cases relied on by the appellants the question was whether a statute passed to authorize a temporary suspension pending proceedings to remove was constitutional, which is altogether another matter, although those cases do adopt the doctrine contended for by the appellants. In this State statutes have been passed authorizing the suspension as well as removal of inferior officers in particular cases, but the Legislature has not seen

fit to give the Governor such power in cases arising under this provision of the Constitution, if it can do so. But without further discussing that subject, or the distinction claimed by the appellants to exist between this case and such as *Gregory* v. *New York,* 113 N. Y. 416, *Emmitt* v. *New York,* 128 N. Y. 117, *State* v. *Jersey City,* 27 N. J. L. 536, and the statements in *Throop on Public Officers,* sec. 404, and *Meachem on Public Officers,* sec. 453, which were cited by the appellees, what we have said is sufficient to show that there was no such consensus of opinion as to the law on this subject, when either of our Constitutions was adopted as to suggest, much less establish, that it was intended to include in this power to remove for cause the power to temporarily suspend, even if we ignore what was said in *Groome* v. *Gwinn* about the effect of section 56 of Article 3 on powers by implication. If the law had been then well established in other jurisdictions, it would be a very violent presumption, in view of the deliberate acts of our constitutional conventions, to conclude that such was the intention, especially when our statutes prescribing the mode of procedure and our decisions are borne in mind.

We will not discuss Federal appointments, as those made by the President cannot be taken as precedents in construing our Constitution and laws. It may have been necessary to give the President such power as he had conferred upon him by Congress, but every one familiar with the history of our country knows how bitterly it was opposed. Possibly those controversies had something to do with the limitations placed upon the Governor of this State in 1851, and since continued. The President of a great country like this could not give up his time to hearing charges against such of the many thousands of officers scattered over our immense territory, as may give offense or may be accused of being incompetent or guilty of misbehavior in office, but the fact is that the sentiment against frequent removals and suspensions of Federal officers has been growing, and has resulted in some Acts of Congress

and orders of the President to prevent it, and the agitation of others. But there can be no reason why the Governor of this State cannot give officers appointed by him, not only a fair and full hearing, but such a speedy one that there can be no necessity for disturbing them in the discharge of their duties before trial.

What we have already said ought to be sufficient to show that in our judgment it was not intended to give the Governor an implied power to suspend, when section 15 of Article 2 gave him the power to remove civil officers for the causes therein named. But there is another convincing reason for not adopting that construction—that is, if the power to suspend was admitted to exist, there is no authority in the Constitution or statute for him to appoint others in the places of those suspended. It cannot be pretended that there is any express power, but it is argued that, as by section 1 of Article 2 of the Constitution the executive power of the State is vested in the Governor, and by section 9 he is required to take care that the laws are faithfully executed, if the power to remove given by section 15 includes the power to suspend temporarily, it is his right and duty to prevent the offices from being unoccupied, and hence he can make the *ad interim* appointments, although not in terms so authorized. Of course it will be observed that that assumes the very important premise, that section 15 does include the power to suspend temporarily, which we do not admit, but if it did, could the Governor make the *ad interim* appointments?

There is no provision or authority for the Governor making an appointment outside of sections 10 and 13 of Article 2, excepting to fill a vacancy, and those two sections refer to the appointments made by the Governor and Senate, and cannot be said to in any way reflect on this question. It was said in *Smoot* v. *Somerville,* 59 Md. 84, referring to sections 11, 13 and 14 of Article 2: "From the language employed in these sections it is manifest that the power of appointment to all civil offices was intended to be, and was, confided, not to

the Governor alone, but to the *Governor and Senate,* and that the Governor has no power to appoint to office, without the advice and consent of the Senate, except to fill vacancies in offices, which may occur during the recess of the Senate, or, as provided by the fourteenth section, within ten days before its final adjournment." Or, as was said by JUDGE ALVEY, in a concurring opinion in that case: "Now it is too clear for question, that the Governor cannot make a vacancy in the office by appointing a successor to the incumbent. The vacancy must actually exist before the power of appointment can be exercised; for it is only the existence of the vacancy that can call into activity the power to appoint." JUDGE ALVEY had previously said: "There is one thing clear, and that is, that it is only a *vacancy* in the office that the Governor, under the Constitution, is authorized to fill, without the concurrence of the Senate," and, after stating that the only exception to making appointments with the advice and consent of the Senate exists in case of vacancies that occur during the recess or within ten days before its adjournment, added: "This exception exists, and is provided for, from the necessity of the case; and it is only in case of a vacancy *so* occurring, that the Governor has power to fill it without the advice of the Senate, and that simply because such advice and consent cannot readily be obtained. *The Governor has no power of appointment except as expressly provided by the Constitution or statute; and if he attempts to make an appointment without such express authority, that appointment would simply be without effect."*

Then section 11 provides that: "In case of any vacancy during the recess of the Senate, *in any office which the Governor has power to fill,* he shall appoint some suitable person to said office, whose commission shall continue in force until the end of the next session of the Legislature, or until some other person is appointed to the same office, whichever shall first occur." If then there was a vacancy which the Governor had power to fill, the appointment would have to be

until the end of the next session of the Legislature, or until some other person is appointed to the said office, whichever shall first occur, and it is not pretended that he had such power in this case. If there was no vacancy, then he had no power to appoint, and hence in neither event could he make these *ad interim* appointments.

But it is clear there was no vacancy, and to admit that there was would be an effective answer to the contention that the Governor had the right to suspend, for there can be no doubt that a suspension which would create a vacancy would be equivalent to a removal. If there are vacancies, and the appellees are acquitted of the charges, they could only be again restored by being reappointed. There could be no possible justification in the attempt to suspend them in view of our Constitution and laws, if the suspension created a vacancy, and hence we will not dwell on that or cite other authorities on that subject.

We cannot understand how such cases as *Robb* v. *Carter*, 65 Md. 321, *County Commissioners* v. *School Commissioners*, 77 Md. 290, *Sappington* v. *Scott*, 14 Md. 56, *Kroh* v. *Smoot*, 62 Md. 172, and others cited in connection with them can aid the appellants. *Robb* v. *Carter* and similar cases are simply to the effect that, in the absence of some limitation, officers in this State hold over until their successors are appointed and qualify, in order to prevent an interregnum. They did not lessen, but lengthened the terms of the offices involved. The expression in *Kroh* v. *Smoot* as to an *ad interim* appointment expressly referred to one in which there was a vacancy, by reason of the recess appointment expiring at the end of the session of the Senate. As the appointee for the regular term would not go into office under section 13 of Article 2 until the first Monday of May, there would be a vacancy between the adjournment of the Legislature and that date, which, like other vacancies, the Governor could fill.

What we have already said will relieve us of further reference to authorities cited from other jurisdictions, and, re-

gardless of them, we are of the opinion that, under the Constitution and laws of this State, as construed and interpreted by this Court:

1st. The Governor had no power to suspend the appellees, pending the proceedings against them for removal; and,

2nd. That he had no power to appoint the appellants, Police Commissioners of Baltimore City, because there were no vacancies in those offices, and he could create none by his orders of suspension which he is authorized by the Constitution to fill.

As the conclusions above announced must result in an affirmance of the order appealed from, which denied the appellants the writ of mandamus applied for, the right to which is the real question in this case, we will not, as urged by the appellees to do, pass upon the sufficiency of the charges or express our views as to the power or propriety of the Governor acting on them, inasmuch as it is admitted that they were made at his instance. It may sometimes be desirable for an appellate Court to determine questions presented to it other than those required for the purposes of its judgment, but it is always a matter of great delicacy for one of the coordinate branches of the Government to pass on or deal with questions which the Constitution or laws submit to another, and it should be avoided, excepting in so far as necessary. We have no right to assume that the Governor cannot or will not give the appellees a fair and impartial hearing, such as the Constitution and laws of the State demand. If, as contended by the appellees, the charges are not sufficient, either because they do not amount to charges of incompetency or official misconduct, or because they are too indefinite, or if the statute does not authorize the Governor to prefer the charges, or have them preferred, and then afterwards hear the case, such questions can and should be presented to the Governor, and will doubtless receive proper consideration by him.

Our refusal to now entertain the above questions cannot prejudice the appellees, for we express no opinion on them, and we are determining a case between the appellees and the appellants, and not one between them and the Governor, who is not a party, although this proceeding is the result of his action.

We deem it proper to add that our examination of the authorities cited has convinced us that our statute regulating the procedure before the Governor in such cases, which was first enacted over a hundred years ago, might with great benefit be amended. In some States the mode of procedure adopted relieves the accused and the one hearing the charges from much of the embarrassment that must necessarily exist when the proceedings are conducted as they seem to be here.

*Order affirmed, the appellants to pay the costs, above and below.*